James L. Kerwin (CO Bar No. 57545)*
William E. Trachman (CA Bar No. 261410)
Grady J. Block (CO Bar No. 55085)**
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
Facsimile: (303) 292-1980
jkerwin@mslegal.org
wtrachman@mslegal.org
gblock@mslegal.org
* Admitted *Pro Hac Vice*
* *Pro Hac Vice* Application Forthcoming

Alexander Haberbush (CA Bar No. 330368)
LEX REX INSTITUTE
444 West Ocean Boulevard, Suite 1403
Long Beach, CA 90802
ahaberbush@lexrex.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOUNG AMERICA'S FOUNDATION; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GENE D. BLOCK, *et al.*,<br><br>Defendants. | No. 2:24–cv–8507 ODW (AGRx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT UNDER FEDERAL RULES 12(B)(1) AND 12(B)(6) [ECF No. 49]**<br><br>Date: March 10, 2025<br>Time:       1:30 p.m.<br>Courtroom: 5D<br>Judge: Hon. Otis D. Wright II |

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................. i

TABLE OF AUTHORITIES................................................... iii

Introduction..................................................................... 1

Background..................................................................... 3

I.      UCLA Is Dominated by Left-Wing and Anti-Israel Orthodoxies. ....................................................... 3

II.     YAF Sought to Bring a Different Perspective to Campus, but UCLA Did Everything it Could to Hamstring the Presentation and Ultimately Shut it Down..................... 5

        A)      The Pre-Event Planning Process ............................ 6

        B)      On the Day of the Event, UCLA Suddenly Reversed Itself, Ordering the Event to Shut Down Unless Moved to a Satellite Location ................................. 7

Argument..................................................................... 10

I.      Defendants Violated the First Amendment By Capitulating to a Potential "Shout Down" Mob and Otherwise Engaging in Viewpoint Discrimination. ........ 10

        A)      By Ratifying a Heckler's Veto, UCLA Necessarily Engaged in Viewpoint Discrimination. ................... 11

        B)      Aside from Ratifying a Heckler's Veto, Defendants Independently Violated the Constitution by Taking Action Based on Animus against Plaintiffs' Point of View. ....................................................... 22

II.     Defendants Are Not Entitled to Qualified Immunity ..... 25

III.    The Claims Against All Defendants Should Stand......... 26

IV.     Standing to Seek Injunctive Relief ................................. 27

V.    UCLA's On-Again/Off-Again Treatment of the Spencer
        Event Demonstrates the Facial Invalidity of Policy 862.        29

Conclusion ......................................................................    31

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Bible Believers v. Wayne Co., Mich.*,
  805 F.3d 228 (6th Cir. 2015)..................................... 11, 13, 18, 25, 26

*Cent. Fl. Nuclear Freeze Campaign v. Walsh*,
  774 F.2d 1515 (11th Cir. 1985).................................. 19

*Chicago Acorn v. Metro. Pier & Exposition Auth.*,
  150 F.3d 695 (7th Cir 1998)..................................... 21

*Cottonreader v. Johnson*,
  252 F. Supp. 492 (M.D. Ala. 1966) .......................... 13, 14

*Dariano v. Morgan Hill Unified Sch. Dist.*,
  767 F.3d 764 (9th Cir. 2014)................................... 12

*Feiner v. New York*,
  340 U.S. 315 (1951)............................................... 14

*Forsyth Co., Ga. v. Nationalist Movement*,
  505 U.S. 123 (1992)..................................... 16, 19, 29, 31

*Glasson v. City of Louisville*,
  518 F.2d 899 (6th Cir. 1975).................................... 14, 25

*Hague v. Cmte. For Indus. Org.*,
  307 U.S. 496 (1939)............................................... 25

*Healy v. James*,
  408 U.S. 169 (1972)............................................... 22

*Jones v. Bd. of Regents of U. of Ariz.*,
  436 F.2d 618 (9th Cir. 1970)..................................... 13, 14, 15, 25

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022)............................................... 22

*Khoja v. Orexigen Therapeutics*, Inc.,
    899 F.3d 988 (9th Cir. 2018)...................................................... 25

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993)..................................................... 12, 19

*Lone Star Sec. & Video, Inc. v. City of Los Angeles*,
    989 F. Supp. 2d, 981 (C.D. Cal. 2013) .................................... 16

*Matal v. Tam*,
    582 U.S. 218 (2017).................................................... 11

*Meinecke v. City of Seattle*,
    99 F.4th 514 (9th Cir. 2024) ................................ 12, 14, 15, 17, 18, 26

*New Century Found. v. Robertson*,
    400 F. Supp. 3d 684 (M.D. Tenn. 2019)............................ 18, 19

*Oliver v. Arnold*,
    19 F.4th 843 (5th.Cir.2021) ............................................ 26

*Ovadal v. City of Madison*,
    416 F.3d 531 (7th Cir. 2005).................................... 13, 17, 21, 25

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)................................................. 16

*Rock for Life-UMBC v. Hrabowski*,
    411 Fed. App'x 541  (4th Cir. 2010)........................................ 18

*Rosenbaum v. City & Cty. of San Francisco*,
    484 F.3d 1142 (9th Cir. 2007)........................................ 17, 19

*Rosenberger v. Rector & Visitors of U. of Va.*,
    515 U.S. 819 (1995)................................................. 10, 17

*Santa Monica Nativity Scenes Cmte. v. City of Santa Monica*,
    784 F.3d 1286 (9th Cir. 2015)........................................ 18, 21

*Seattle Mideast Awareness Campaign v. King Cty.*,
    781 F.3d 489 (9th Cir. 2015)......................................... 20

*Terminiello v. City of Chicago,*
   337 U.S. 1 (1949) ....................................................................... 11

*TikTok Inc. v. Garland,*
   2025 WL 222571 (U.S. Jan. 17, 2025) ..................................... 19

*Tinker v. Des Moines Indep. Sch. Dist.,*
   393 U.S. 503 (1969) ................................................................. 12

*U. of MD Students for Justice in Palestine v. Bd. of Regents of the U.*
   *System of MD,*
   2024 WL 4361863 (D. Md. 2024) ............................................ 18

*W. Virginia State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ................................................................. 12

**Statutes**

42 U.S.C. § 1983 ......................................................................... 26

Pls' Mem. IOT Defs' MTD
Case No. 2:24-CV-8507-ODW-AGR

# INTRODUCTION

UCLA says it is "committed to freedom of speech." Defendants' Mem. [ECF 49-1] ("DefBr.") at 1. It pays lip service to the idea that free speech is a "protected right," and acknowledges that the school's "core mission" of pursuing knowledge "depends on it." *Id.* Its written policies echo these ideals, and provide that student organizations are entitled to use "University properties for meetings, programs, and events for purposes of speech and advocacy." Compl.[ECF No. 1]Ex.A at 82. But as Plaintiffs Young America's Foundation, Brooke Broll, and Macy Roepke ("YAF" or "Plaintiffs") learned, UCLA's high-minded, rhetorical "commitment" is paper thin, and extends only to speakers with the "correct" opinions. Those, like YAF and its invited speakers, who disagree with campus orthodoxy—especially when their views arouse anger from activist "shout down" mobs—need not apply. This lawsuit challenges UCLA's discrimination against Plaintiffs' viewpoint.

In May 2024, after having inexplicably delayed the administrative process for so long that YAF was forced to threaten legal action, UCLA finally approved a talk by Robert Spencer to provide a conservative and pro-Israel point of view on a campus dominated by a left-wing and anti-Israel activism (both official and unofficial). Along the way, UCLA severely hobbled YAF's ability to promote the event. As for the event itself, UCLA knew that activists with a strong antisemitic and anti-

Pls' Mem. IOT Defs' MTD
Case No. 2:24-CV-8507-ODW-AGR

Israel bent would not be pleased that Spencer was speaking on campus, and would likely attempt to shout him down.

UCLA had more than enough time to marshal security resources to prevent violence or disruption.  Indeed, UCLA assured YAF that the security situation was well in hand, and, in reliance those assurances, YAF contracted for, advertised, and planned for the event at a specific place and time—in a prime room in the Student Union building, the intellectual and social center of campus, suitable for discussion of weighty topics, and a place where YAF would attract a significant audience.

At the last second, however, UCLA suddenly reversed itself, and claimed to be unprepared to provide security.  UCLA ordered the lecture shut down unless Spencer agreed to move to an outer-campus location, where his audience would be dramatically limited.  Nothing had changed following UCLA's prior assurances, except that it was now too late for YAF to direct audience members to a new location.

The most charitable interpretation of UCLA's actions is that it anticipated a difficult evening dealing with anti-Israel hecklers, and simply took the easy way out.  But even that, under well-established law, violated the First Amendment.  Spencer's speech was effectively driven from the marketplace of ideas *because hecklers objected to his viewpoint*, even if, hypothetically, the individual Defendants were

indifferent to his views.  As Defendants concede, viewpoint discrimination violates the First Amendment.  For this reason alone, Defendants' motion to dismiss must be denied.

But there is more: the facts alleged in the complaint easily support an inference that Defendants were motivated by a desire to undermine Spencer *because they disagreed with and sought to silence his pro-Israel and conservative views*.  If ever there were a group of university administrators whose conduct signaled antipathy to Israel, Defendants are surely in it.  One need only glance at the record: UCLA has turned a blind eye to attacks against "fucking Jews," has tolerated "Jew exclusion zones," has funded an "activist in residence" who explicitly calls for the elimination of Israel, etc.  Indeed, this was not even the first time that Defendants shamefully acquiesced to a campus shout down mob silencing pro-Israel views.

Either way, the complaint adequately alleges that Defendants engaged in viewpoint discrimination.  Their motion to dismiss must be denied.

## BACKGROUND

## I.   UCLA Is Dominated by Left-Wing and Anti-Israel Orthodoxies.

UCLA has been named a "hotspot" for anti-Israel and antisemitic activism, and one of the worst campuses in the United States for ideological diversity, especially on the topic of the Israel-Palestinian

conflict.  Compl.¶¶37-40&n.1; *see also id.*¶39 ("[F]ifty percent of Jewish UCLA students expressed discomfort about stating their opinions on the Israel-Palestinian conflict on campus due to the anti-Israel environment.").  Anti-Israel orthodoxy pervades essentially all of UCLA's institutional structures, from the official faculty and administrative level—including an avowedly left-wing and anti-Israel "activist in residence" program, *id.*¶¶60, and curricular instruction on the theory that Israel is a "settler colonialist" project, ¶48—to the level of student government —including the UCLA Cultural Affairs Commissioner who "honored" Hamas terrorists in an official post immediately after they slaughtered hundreds of civilians on October 7, 2023, ¶53—and all the way down to the level of student and faculty activist groups.

UCLA's top leadership has, time and again, turned a blind eye to, or even encouraged, virulent left-wing antisemitic and anti-Israel misconduct.  *Id.*¶¶46-47, 51-55 (activists chanting "slaughter the Jews," "death to Jews," and "beat that fucking Jew" without consequence), 56 (defendants, including specifically Defendant Block, knew but did nothing about these incidents), 58 (Block knew but let slide intimidation of Jews and Israelis by masked activists who used large knives to stab and remove Israeli hostage posters), 71 (Defendant Block

instructed campus police to stand down and not to enforce criminal laws and campus rules against anti-Israel lawbreakers).

Unsurprisingly, given consistent signals by UCLA leadership that anything goes for left-wing groups, activists have been emboldened to shout down those with whom they disagree. For example, in February 2024, a talk by the former Israeli Minister of Foreign Affairs was scuttled and forced to retreat to an online-only format when UCLA did nothing to address threats by anti-Israel activists. *Id.*¶79. As detailed below, YAF came in for similar treatment a few months later.

## II. YAF Sought to Bring a Different Perspective to Campus, but UCLA Did Everything it Could to Hamstring the Presentation and Ultimately Shut it Down.

In April 2024, YAF arranged to have Middle East expert Robert Spencer give a lecture and Q&A on the Israel/Hamas conflict. *Id.*¶80. Spencer's views contrast starkly with the campus activist class and UCLA's leadership. YAF did not expect that Spencer would immediately persuade pro-Hamas ideologues to change their minds; it sought only to expose them to other ways of thinking. *Id.*¶86. Of course, Plaintiffs are not naïve, and they knew (as did UCLA) that anti-Israel activists would be displeased and would likely try to "deplatform" Spencer by shouting him down. Knowing this, YAF sought to engage UCLA's administrators at the earliest opportunity, with plenty of time

to prepare for the hecklers.  UCLA responded with a campaign of obstruction.

A)    <u>The Pre-Event Planning Process</u>

On April 13, 2024, more than a month in advance, YAF started the process of reserving a room at the Student Union and arranging for security.  *Id.*¶82.  The talk was targeted for May 15, 2024.  Although a suitable room in the Student Union was identified by April 16, 2024, *id.*¶83, UCLA would not give the necessary approvals until May 6, 2024, *id.*¶98, and then only after being threatened with a lawsuit due to multiple delays, *id.*¶¶96-98 & Ex. B.  UCLA's approval incorporated assurances that security would be provided at the Student Union building; indeed, a major focus of the pre-event planning was YAF's request for security against hecklers.  *Id.*¶¶84-85, 90-93, 97-98.

Because UCLA's policies forbid publicizing an event prior to "final approval," the delays were not just frustrating, they undermined YAF's ability to generate audience interest.  *Id.*¶¶87-88.  YAF did its best to advertise the event in the short time left, but it was further limited when Defendant Rush invented a "rule" against projected announcements.  *Id.*¶¶101-05.  As everyone knew they would, anti-Israel activists signaled they would demonstrate against the Robert Spencer event and attempt to shut it down.  *Id.*¶103.

Pls' Mem. IOT Defs' MTD
Case No. 2:24-CV-8507-ODW-AGR

B)    <u>On the Day of the Event, UCLA Suddenly Reversed Itself, Ordering the Event to Shut Down Unless Moved to a Satellite Location</u>

Despite having had more than a month to prepare, and having previously determined that security arrangements were adequate, on the day of the event, UCLA suddenly changed its tune. YAF representatives who had arrived to set up audio-visual equipment were literally locked out and made to wait for hours before any explanation was given. *Id.*¶¶107-09. But even then, the "explanation," was no such thing. Instead, Defendant Braziel simply told YAF that UCLA was "unprepared" to secure the event against a counter-protest. *Id.*¶109. Braziel ordered that the event be shut down unless YAF agreed to move it to a location approximately half a mile away at the outer edge of campus, in a lecture hall at the back of a computer science building. *Id.*¶111.

Braziel refused to explain the basis for UCLA's sudden reversal. *Id.*¶¶109, 112. In support of its motion to dismiss, UCLA now submits a declaration from Braziel that sets forth, for the first time, allegations concerning UCLA's preparation for the event and purported reasons for insisting that it be shunted out of the way. Braziel Decl. ECF No.49-7. According to Braziel's declaration, "UCLA planned to have . . . over 30 UCPD officers, six civilian staff, and up to 43 private security staff" on hand but that even with this deployment of resources, UCLA would be

unable to secure a room in the Student Union because the building was "multistory, multiuse" and contained a restaurant, study rooms and other facilities.  *Id.*¶¶4, 6.  Braziel's *post hoc* rationalizations for UCLA's conduct prepared for this litigation are not properly before the Court on this motion to dismiss, and should be disregarded.

But even if his declaration were considered, it strongly undermines UCLA's position.  That the Student Union was "multistory and multiuse" was not a secret; nor was the fact that Spencer's views were unpopular with terror sympathizers—yet UCLA previously determined that the venue could be secured.  UCLA's decision to wait until the last minute to suddenly re-think its security assessment, apparently based on obvious information about the building, after the location had been publicized and after it was too late to inform intending audience members of a change, is highly suspect, and strongly suggests bad faith.

In any event, UCLA's demand that the event be moved to the outer-campus location was unreasonable.  In addition to the fact that it would dramatically reduce planned attendance, limited foot traffic in that part of campus would further suppress spontaneous turnout, and the room was not able to accommodate the audio-visual equipment YAF required for creating a documentary film to be broadcast at a later time (as it had previously informed UCLA).  Compl.¶¶117-18.  Moreover, it

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

was simply not true that moving the event to the computer science building annex would have increased security in any appreciable way. *Id.*¶113-15, 119.  While UCLA said it would put up signage to help audience members find their way along the half-mile route, it did not explain why anti-Israel activists could not also have followed the signs or simply removed them to suppress turnout.  And, importantly, there was a real and significant symbolic penalty with being shunted to an outer-campus location.  As alleged in the complaint,

> YAF deserved not only to host a pro-Israel event, it deserved to host it in the center of campus life to show that there are other legitimate views worth discussing on the issue of Israel and that their speech did not represent a second class point of view . . . Forcing the event to retreat to an outer-campus computer science lecture hall, on the other hand, would also have sent a message—that UCLA disagreed with the distasteful opinions of pro-Israel speakers like Robert Spencer, that the university sided with the counter-protestors who sought to shut Spencer down; and that the university's commitment to 'free expression' was merely a front.

Compl.¶¶120-21.

As a result of UCLA's machinations, the event was canceled.  An anti-Israel activist issued this tweet celebrating UCLA's censorship:

Pls' Mem. IOT Defs' MTD
Case No. 2:24-CV-8507-ODW-AGR



*Id.* ¶125.

Another activist posted this:



Message received.

## ARGUMENT

## I.   Defendants Violated the First Amendment By Capitulating to a Potential "Shout Down" Mob and Otherwise Engaging in Viewpoint Discrimination.

As all sides agree, the First Amendment, "forbid[s UCLA from] exercis[ing] viewpoint discrimination, even [in a] limited public forum . . . of its own creation." *Rosenberger v. Rector & Visitors of U. of Va.*, 515 U.S. 819, 829 (1995).[1]  YAF has adequately pleaded that UCLA violated this principle in two ways.

### A)   By Ratifying a Heckler's Veto, UCLA Necessarily Engaged in Viewpoint Discrimination.

Government officials violate the Constitution when they burden speech because of personal disagreement with a speaker's point of view, but "viewpoint discrimination need not take that form in every instance." *Matal v. Tam*, 582 U.S. 218, 250 (2017)(Kennedy, J. concurring).  Instead, it is well established that when a government official ratifies a so-called "heckler's veto," he engages in viewpoint discrimination whether or not he personally disagrees with the speaker being silenced by the mob.

---

[1]   UCLA argues that the venue for Spencer's lecture was a limited public forum, a type of facility over which the government has a relatively free hand to regulate speech.  Plaintiffs disagree with that characterization, but do not contest it for purposes of this motion because Defendants' viewpoint discrimination violated the First Amendment even under the standards applicable to limited public fora.

Free speech comes with a cost—the expression of controversial views "invite[s] dispute," and may "stir people to anger," and, in some cases, potentially to violence against the speaker. *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). Often the easiest thing for an officer to do is to silence the speaker, removing the provocation and quieting the crowd. *See Bible Believers v. Wayne Co., Mich.*, 805 F.3d 228, 250 (6th Cir. 2015)(turning on the speaker is "an easy alternative to dealing with a lawless crowd that is offended by what [he] has to say"); *see also Meinecke v. City of Seattle*, 99 F.4th 514, 523 (9th Cir. 2024)(relocating a peaceful speaker rather than addressing violent reactions of hecklers was "for the convenience of the officers").

But giving in to hecklers is not only counterproductive, *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 770-71 (9th Cir. 2014)(O'Scannlain, dissenting from denial of reh'g *en banc*)(creates "perverse incentive[s]" and sends a message that "by threatening violence against those with whom you disagree, you can enlist the power of the State to silence them"), but also violates the constitutionally-required balance between speech and public tranquility. *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 508-09 (1969)("Any word spoken . . . that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk.").

Worse, because hecklers represent local majorities that seek to silence minority views, giving effect to their desires results in the primary evil the First Amendment is designed to protect against—hollowing out the marketplace of ideas, and replacing it with a system of orthodoxy backed up by the threat of force.  *See W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943)("Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard."); *see also Bible Believers*, 805 F.3d at 252-53 (ratifying a heckler's veto allows "the crowd [to] impose[], through violence, a tyrannical majoritarian rule").

Accordingly, courts recognize that where a peaceful speaker is threatened with violence by those who disagree, governmental authorities have an affirmative duty to protect the speaker by addressing the hecklers' conduct.  *See, e.g.*, *Jones v. Bd. of Regents of U. of Ariz.*, 436 F.2d 618, 621 (9th Cir. 1970)(University police have affirmative "obligation of affording [a peaceful, but unpopular speaker] . . . protection" against hecklers who tore signs/sandwich boards from his body); *see also Bible Believers*, 805 F.3d at 251; *Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005) )("The police must preserve order when unpopular speech disrupts it; does it follow that the police may silence the rabble-rousing speaker? Not at all. The police must

permit the speech and control the crowd; there is no heckler's veto." (cleaned up)).

Limiting a peaceful speaker's expression (including by moving him to a purportedly "safer" location) because of the potential for violence by hecklers is therefore unconstitutional unless the government has "first ma[d]e bona fide efforts to protect the speaker from the crowd's hostility by other, less restrictive means." *Bible Believers*, 805 F.3d at 255. While the government's duty is not unlimited, *id.* at 253 (officers not required to "go down with the speaker"), it requires at a minimum that the government take "such steps as may be reasonably necessary and feasible" to protect the speaker. *Cottonreader v. Johnson*, 252 F. Supp. 492, 497 (M.D. Ala. 1966); *see also Meinecke*, 99 F.4th at 525 (burdening speech in deference to the wishes of a hostile mob is unconstitutional if there are "less speech-restrictive alternatives to achieve public safety" available to the government); *Glasson v. City of Louisville*, 518 F.2d 899, 906 (6th Cir. 1975); *Jones*, 436 F.2d at 622 (campus police must provide an unpopular speaker with "the same protection against violent or other unlawful acts as would be afforded to any other individual."); *Feiner v. New York*, 340 U.S. 315, 326 (1951)(Black, J. dissenting)("The police of course have power to prevent breaches of the peace.  But if, in the name of preserving order, they ever can interfere with a lawful

public speaker, they first must make all reasonable efforts to protect him.").

Taking the allegations in the complaint as true, it is clear UCLA failed to discharge its duty to take reasonable steps to protect Spencer from the potential that counter-protestors would disrupt his event before turning on him and burdening his speech. UCLA knew for weeks that anti-Israel activists would target the lecture, it knew about the physical layout of the venue, including its exits and entrances and any potential security vulnerabilities, and it had more than enough time to marshal adequate resources.[2] Despite all of that, at the very last second, UCLA suddenly declared it was unprepared, and ordered Spencer to move to an outer-campus location

UCLA suggests that the First Amendment was not implicated at all when it acted against Spencer because it demanded that he "move the event" to an out-of-the-way location rather than "cancel it." DefBr. at 12. In *Meinecke*, the Ninth Circuit squarely rejected the same

_____

[2]    In its recitation of the timeline, UCLA intimates that its security forces were occupied with an attempt by anti-Israel protestors to "reoccupy a portion of UCLA's campus," around the same time as the May 15 event. DefBr. at 6. Leaving aside that the allegations should be disregarded on this motion because the complaint makes no mention of any alleged "reoccupation" (and Plaintiffs are not aware of any), even assuming the allegation is true and cognizable, this was nine days before the Spencer event and therefore has no bearing on the reasonableness of UCLA's preparations.

argument. 99 F.4th at 524 (city could not avoid scrutiny on the ground that it "merely sought to relocate [the plaintiff's] speech rather than ban it . . . by mov[ing him] to a safer location." (cleaned up)); *see also Jones*, 436 F.2d at 622 ("One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").  And, as noted above and as alleged in the complaint, being required to move to the outer reaches of campus was more than simply inconvenient.  It would have frustrated Spencer's ability to reach and interact with an audience, made it impossible to film the lecture for later distribution, and would have sent a strong symbolic message of official disapproval of the pro-Israel point of view. *See, e.g. Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 989 F. Supp. 2d, 981, 992 (C.D. Cal. 2013)(location particularly important when it is "part of the expressive message").[3]

Where, as here, government ratifies a heckler's veto, it necessarily engages in viewpoint discrimination.  That's because hecklers seek to drive a particular view out of the public conversation, and, by giving the heckler's what they want, the government adopts and effectuates the

---

[3]      UCLA also asserts that there was no burden on Mr. Spencer's speech because his "event occurred on May 15," DefBr. at 12, pursuant to an alleged "agreement between YAF and Braziel that [it] shift to a closed, recorded format."  *Id.* at 7.  Needless to say these allegations, which Plaintiffs flatly deny, are not properly before the Court on this motion to dismiss and should be disregarded.

Pls' Mem. IOT Defs' MTD
Case No. 2:24-CV-8507-ODW-AGR

mob's purposes.  Put another way, the "chain of causation" runs directly from the speaker's viewpoint to his exclusion from the marketplace of ideas.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 n.7 (1992)(rejecting assertion that burdening speech based on an anticipated "violent response" is justified by government's interest in addressing "secondary effects" such as public safety).  Even UCLA concedes that engaging in viewpoint discrimination violates the Constitution.  Accordingly, its motion should be denied.

Seeking to avoid the inevitable outcome, UCLA attempts a sleight of hand. It argues that because courts often refer to the heckler's veto as a "content based" restriction on speech, it is therefore not a "viewpoint-based" restriction.  *See* DefBr. at 12.  UCLA further suggests that because "content-based" (but not viewpoint-based) criteria are allowed when government decides who can and cannot use a limited public forum, and because the venue here was a limited public forum[4] the heckler's veto claim fails.  *Id.*; *see also id.* at 2 ("Plaintiffs cannot plausibly claim a violation of the heckler's veto doctrine because UCLA's campus . . . is a limited public forum.").

This is mere wordplay.  It is true that courts often refer to the heckler's veto as a "content-based" speech restriction.  *See, e.g.*, *Meinecke*, 99 F.4th at 522; *Rosenbaum v. City & Cty. of San Francisco*,

---

[4]  *But see* n.1 *supra*.

484 F.3d 1142, 1158 (9th Cir. 2007); *Ovadal*, 413 F.3d at 537. But the "content" of speech has two distinct meanings: First, it can refer to the "subject matter" or general topic being discussed. *Rosenberger*, 515 U.S. at 829. Second, it also includes "particular views taken by speakers on a subject." *Id.* Crucially, discrimination on the basis of viewpoint is "but a subset or particular instance of the more general phenomenon of content discrimination." *Id.* at 830-31. Accordingly, courts deciding heckler's veto cases generally have "no reason to differentiate between the terms, as the same standard applie[s] to both." *New Century Found. v. Robertson*, 400 F. Supp. 3d 684 (M.D. Tenn. 2019). An inference from a court's description of the heckler's veto as "content based" to the conclusion that it necessarily must not be "viewpoint based," is therefore unsound.

And, when courts do have occasion to drill down on the issue, they uniformly (and rightly) identify the doctrine as viewpoint based. In *Meinecke*, for example, the Ninth Circuit held that when the government gives in to a heckler's veto, it is "simply *choosing sides* in the debate." 99 F.4th at 524 (emphasis added). To "choose sides in a debate" is to react to a viewpoint, not to a general subject matter. Other authorities are in agreement. *See, e.g.*, *U. of MD Students for Justice in Palestine v. Bd. of Regents of the U. System of MD*, 2024 WL 4361863 at *10 (D. Md. Oct. 1, 2024)(university speech restriction

"motivated by a concern . . . that violence might ensue" was "neither viewpoint-neutral, nor content-neutral"); *Bible Believers*, 805 F.3d at 248 (6th Cir. 2015)("Viewpoint discrimination is censorship in its purest form . . . the heckler's veto is precisely that type of odious viewpoint discrimination."); *Santa Monica Nativity Scenes Cmte. v. City of Santa Monica*, 784 F.3d 1286, 1294 (9th Cir. 2015)(heckler's veto is when government burdens "a *particular message* because of the audience's reaction to it" (emphasis added)); *Rock for Life-UMBC v. Hrabowski*, 411 Fed. App'x 541, 552  (4th Cir. 2010) ("[S]afety concerns arising from a prediction of how listeners might react to speech cannot be effectively de-coupled from speech content."); *Rosenbaum*, 484 F.3d at 1159 (characterizing plaintiffs' "'heckler's veto' claim [as a] *viewpoint discrimination* [claim]" (emphasis added)); *Cent. Fl. Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1525 (11th Cir. 1985)(burdening speech based on potential for hostile counter activity violates that "principle of equality of expression . . . [which means that "all *points of view* [must be afforded] an equal opportunity to be heard." (emphasis added)); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 395-96 (1993)(rejecting possible hecklers' threats of "public unrest and even violence," as "difficult to defend as a reason to deny the presentation of a religious point of view"); *Forsyth Co., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992)(holding that "hostility .

. . based on content . . . [involves] express[ing] views unpopular with [hecklers].”); *see also New Century Found.*, 400 F. Supp. 3d at 701 (citing *Bible Believers* for the proposition that “a heckler’s veto is never viewpoint neutral.”).

Adding force to this analysis, the Supreme Court has identified a simple test to confirm whether a “restriction, penalty, or burden” on speech is due to its substance: ask whether the speaker could “avoid or mitigate the effects of the [government action] by altering [his] speech.” *TikTok Inc. v. Garland*, 2025 WL 222571, at *5 (U.S. Jan. 17, 2025). That test is easily met here. Had Spencer experienced (or pretended to experience) a change of heart and announced before his talk that he was switching sides and taking up the *anti*-Israel point of view, there would have been no shout-down mob, and UCLA would not have claimed an inability to protect him without having first made reasonable attempts to do so. In other words, Spencer could have “avoided or mitigated” UCLA’s actions by changing the *viewpoint* of his expression. Because ratifying a heckler’s veto is inherently an instance of viewpoint discrimination, which even UCLA concedes is unconstitutional, Defendants’ motion must be denied.[5]

---

[5]   The only time restricting speech due to potential audience hostility may appropriately be deemed subject matter- as opposed to a viewpoint-based is when ideological opponents threaten and counter threaten violence and disruption in response to the other sides’ speech

And it is no answer to say that UCLA officials were purportedly motivated by "security" concerns rather than viewpoint-related animus. Where the "proffered justification for [limiting the plaintiff's speech] is directly related to the reactions of [the hostile audience,]" the animus of the crowd is what matters, not a police officer's purportedly neutral desire to maintain public safety. *Ovadal*, 416 F.3d at 537. Even if "[t]he motive is innocent, . . . the discriminatory effect too great to be permitted." *Chicago Acorn v. Metro. Pier & Exposition Auth.*, 150 F.3d 695, 701 (7th Cir 1998). This is so because "the logic underlying the heckler's veto [is the danger] that *particular* speech will be wrongfully excluded from the marketplace of ideas merely because it is offensive to some of its hearers." *Santa Monica Nativity Scenes Cmte.*, 784 F.3d at

---

and the government simultaneously restricts *all sides* from speaking. This type of mutual combat was at issue in *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489 (9th Cir. 2015)(*SeaMAC*), a case heavily relied on by UCLA. There, two diametrically opposed groups sought to run ads on the sides of public transit busses—one side denigrating Israel, the other denigrating Palestinians. *Id.* at 494-95, 502. Objectors to both sides' messages threatened violence and disruption to the public transportation system. In response, the government "simultaneously rejected *all* pending ads on the Israeli-Palestinian conflict." *Id.* at 502. The Ninth Circuit affirmed summary judgment dismissing claims of viewpoint discrimination for the simple reason that the transit authority's decision to exclude an *entire topic of discussion* from its advertising program did not amount to viewpoint discrimination. *SeaMAC* has no application here. UCLA has not removed from campus discussion the *topic* of the Israel-Hamas conflict. What it has done is to burden a *specific point of view* within that topic.

1294 (cleaned up, emphasis in original).  The point of the heckler's veto doctrine is to prevent the scenario where the hecklers win and government, through inaction, allows the marketplace of ideas to become a monolith where only orthodox ideas may be spoken aloud.  To be sure, government officials must address security concerns; but when they arise from hecklers seeking to silence disfavored views, the First Amendment calls on the government to do so *in a specific way*: by *confronting the hecklers*, not by turning on peaceful speakers to quiet the crowd.

Allowing activist mobs to dictate which ideas can and cannot be admitted to discussion is always problematic, but in the university setting it represents a potential calamity.  "The vigilant protection of constitutional freedoms is nowhere more vital" than on college campuses, which are "peculiarly the marketplace of ideas." *Healy v. James*, 408 U.S. 169, 180 (1972).  This is not just because the search for truth demands that all views be heard, but also because universities are the training ground for future leaders who must, if a pluralistic society is to survive, "learn[] how to tolerate diverse expressive activities." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 541 (2022).  The students at UCLA (some of whom will one day hold political power) who believe it acceptable to shout down those with whom they disagree have not learned this vital lesson.  UCLA owes a duty to help them learn.  At

the same time it failed in that duty, it violated Plaintiffs' First
Amendment rights.

      B)    <u>Aside from Ratifying a Heckler's Veto, Defendants
Independently Violated the Constitution by Taking Action
Based on Animus against Plaintiffs' Point of View.</u>

As UCLA concedes, viewpoint discrimination also occurs when
government actors burden speech out of a desire to suppress a point of
view. DefBr. at 9. UCLA contends that the allegations in the complaint
are insufficient to support an inference of this type of viewpoint
discrimination. But this is just wishful thinking.

UCLA's primary contention, repeated at least four times in its
brief, is that "Plaintiffs' own allegations confirm that [Spencer's] event
was moved because of security concerns." DefBr. at 2; *see also id.* at 9
("[T]he Complaint itself alleges [that] the 'purpose' of UCLA's actions
was to ensure the safety and security of its campus."), 10, 14. This is
disingenuous. While the complaint alleges UCLA *claimed* its
determinations were security-driven, it also alleges that those claims
*were not true* and that the real reason was anti-conservative and anti-
Israel animus. *See, e.g.* Compl.¶119. And the complaint provides scores
of allegations showing Defendants' strong ideological biases as backup.
*See supra*, pp. 3-9.

UCLA argues next that the complaint lacks "any example of a
Defendant holding anti-Israel views," and that the complaint "to the

contrary, . . . confirms that Defendant Block . . . expressly condemned antisemitism." DefBr. at 9. This too is disingenuous. While true that Block issued statements that purported to "condemn antisemitism," these statements merely deflected attention from his anti-Israel and left-wing ideological commitments. Actions speak louder than words. And Block's bias is more than sufficiently supported facts such as that, on his watch and under his direction, UCLA

- Funded a virulently antisemitic leftwing "activist in residence," Compl.¶60;

- Hosted numerous anti-Israel conferences and speakers, including ones that slandered Israeli soldiers as murderers of children "for sport," *Id.*¶42;

- Failed to respond to numerous instances of campus antisemitism, including intimidation against Jews and Israelis that was plainly unlawful, *Id.*¶¶46-47, 51-55, 58-59, 71;

- Deferred to a shout-down mob that set out to silence a speech by a former Israeli minister, *Id.*¶79;

- Ordered the UCLA Police Department to "stand down" and not interfere with activists who were engaged in widespread violence and intimidation of Jewish and pro-Israel students, *Id.*¶71;

- Authorized UCLA security to *assist* the anti-Israel activists, *Id.*¶72.

UCLA's final argument is that UCLA gave putative "final approval" for Spencer to speak on campus, "which would be inexplicable if UCLA disfavored Spencer's viewpoint." What UCLA leaves out is

that the "final approval" came only after UCLA was threatened with a lawsuit for its numerous on-again, off-again delays and stall tactics. And even without that, it is not hard to imagine that a campus official could putatively "approve" an event while hoping to later find an excuse to shut it down because of disagreement with its message. Indeed, the allegations in the complaint plausibly allege that that is exactly what happened here. For all of these reasons, UCLA's challenges to the viewpoint discrimination claim fail.[6]

---

[6]      In its argument on the merits, UCLA improperly attempts to introduce several allegations outside of the complaint. *See* DefBr. at 5-7 (alleging, *inter alia*, clashes between pro- and anti-Israel groups in the weeks before the Spencer event, and that Mr. Spencer's talk was not cancelled at all but occurred in the Student Union "to a closed audience, pursuant to an agreement between YAF and Braziel"). To the extent they have any knowledge of these allegations, Plaintiffs deny them. In any event, they are not properly before the court on this motion. Plaintiffs anticipate that UCLA may argue that some of its allegations appear in documents incorporated referenced in the complaint. While true that the complaint cites declarations submitted by UCLA in a separate lawsuit, that does not mean Plaintiffs have adopted every statement made in those declarations, no matter how self-serving. As the Ninth Circuit has held, "if [a] document [outside the pleadings] merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint. Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Khoja v. Orexigen Therapeutics*, Inc., 899 F.3d 988, 1002 (9th Cir. 2018). The Court should not consider any of the extraneous materials or allegations submitted by UCLA on its 12(b)(6) motion.

## II.    Defendants Are Not Entitled to Qualified Immunity

Caselaw going back at least fifty years firmly establishes that UCLA had a duty to take reasonable action to protect Robert Spencer from potential hecklers before burdening his speech.  *See, e.g. Jones*, 436 F.2d at 621; *see also, e.g. Bible Believers*, 805 F.3d at 251; *Ovadal*, 416 F.3d at 537; *Glasson*, 518 F.2d at 906-07; *Hague v. Cmte. For Indus. Org.*, 307 U.S. 496, 516 (1939).  Accordingly, no reasonable government official in Defendants' position could have been surprised to learn of his potential liability.  *See, e.g.*, *Bible Believers*, 805 F.3d at 258 (denying qualified immunity in analogous circumstances because caselaw of decades long standing "alerted Defendants that removing a peaceful speaker, when the police have made no serious attempt to quell the lawless agitators, could subject them to liability").

Moreover, Defendants not only had a clearly established body of caselaw to draw on in order to understand their legal duties, here they were "specifically put on notice," *Bible Believers*, 805 F.3d at 258, on May 1, 2024, when YAF sent a letter to UCLA's Chief Campus Counsel citing relevant authority, including *Meinecke*.  Compl.¶96 & Ex.B. Where, as here, a party specifically warns government actors against

ratifying a heckler's veto, qualified immunity is particularly inappropriate. *Bible Believers*, 805 F.3d at 258.[7]

## III.    The Claims Against All Defendants Should Stand

UCLA asserts that because Plaintiffs' complaint "focus[es] on the decision to move the Spencer event," and purportedly "only identifies one Defendant (Braziel) as playing any role in that decision," the claims against the other Defendants should be dismissed.  DefBr. at 18.  Since these assertions are false, the Court should deny UCLA's request.

First, the complaint covers more than just the events of May 15, 2024.  UCLA's course of conduct against Mr. Spencer started as early as mid-April 2024.  Compl.¶82.  Almost immediately, UCLA began to slow-roll the administrative process while the window for effective advertising was shrinking.  The complaint specifically identifies Defendant Cohn as the moving force behind these tactics. *Id.*¶¶82, 89-90, 92.  The complaint also alleges the personal involvement of then-Chancelor Block. *Id.*¶¶91.  Indeed, not only does the complaint allege that Block was involved from at least April 2024, but on May 1, 2024,

---

[7]  Moreover, qualified immunity is unsupported by 42 U.S.C. § 1983, *Oliver v. Arnold*, 19 F.4th 843, 852 (5th.Cir.2021)(Ho, J. concurring in denial of reh'g *en banc*), and should be overruled.  Plaintiff recognizes the Court is required to reject this argument but respectfully raises it here to preserve the issue for possible Ninth Circuit and Supreme Court review.

YAF sent a letter to UCLA's Chief Campus Counsel threatening a lawsuit due to UCLA's delays, which resulted in action (finally) being taken by UCLA. *Id.*¶96 & Ex.B.  This connection to the highest level of UCLA's administrative structure further supports the allegations concerning Block, as well as the involvement of Defendants Hunt, Levine, Beck, Gorden and Deluca. *Id.*¶¶24-28.  The complaint also alleges specifically that Defendant Rush ordered YAF to cease advertising for the event based on a pretextual claim that campus rules prohibited projected signs (no such rule existed). *Id.*¶105.  The complaint contains sufficient allegations to apprise each Defendant of the claims against them.

## IV.     Standing to Seek Injunctive Relief

Plaintiffs seek injunctive relief to prevent UCLA from granting heckler's vetoes against conservative and pro-Israel voices in the future. UCLA asserts that Plaintiffs' fear that this will happen is speculative because a YAF-sponsored speech by conservative commentator Ben Shapiro took place on October 21, 2024, after the complaint was filed. According to UCLA, because the Ben Shapiro event "[p]roceed[ed s]moothly," Plaintiffs need not worry about the future.  DefBr. at 7.

This argument is not persuasive.  First, the Ben Shapiro event most definitely did not "proceed smoothly."  As detailed in the attached Declaration of Madison Hahn, as with Robert Spencer, UCLA did

everything it could to derail Shapiro during the event planning phase. Although YAF started the process months in advance, UCLA initially refused even to respond for *weeks on end*, and then threw up roadblock after roadblock, repeatedly moving the goalposts by inventing new bureaucratic requirements for YAF to complete before obtaining "final approval." Decl. of M. Hahn IOT Mot. to Dismiss¶¶9-10. As with the Spencer event, UCLA's delay tactics cost YAF dearly in terms of the time remaining to generate publicity and audience interest. *Id.*¶11. All told, UCLA put YAF through more than 70 days of needless paperwork, e-mail exchanges, and zoom calls. *Id.*¶9. In the end, UCLA only approved the event and its logistics a mere four days in advance on October 17, 2024, and then only *after being threatened with a TRO* filing in this matter. *Id.*¶¶9-10. That UCLA played a brinkmanship game in connection with the Ben Shapiro event only adds to the likelihood of future First Amendment injury.

Moreover, UCLA cannot claim to have turned over a new leaf on the heckler's veto. Just because a significant shout-down mob did not materialize for the Shapiro event does not mean one will not materialize in the future. And, as alleged in the complaint, UCLA has now *institutionalized* the heckler's veto in its official policies. UCLA's new rules, adopted during the summer of 2024, place a hard cap the number of controversial speakers whose viewpoints stir campus shout

down mobs (i.e., a limit on conservative and pro-Israel speakers, who are the only ones likely to inspire a shout down).  Compl.¶¶146-53.  For these reasons, Plaintiffs reasonably anticipate future violations of their First Amendment rights and UCLA's standing argument lacks merit.

**V.    UCLA's On-Again/Off-Again Treatment of the Spencer Event Demonstrates the Facial Invalidity of Policy 862.**

If a speech-affecting policy allows "appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted[.]" *Forsyth Cnty.*, 505 U.S. at 131.  To pass constitutional muster, speech-limiting policies must contain language that includes "narrowly drawn, reasonable and definite standards," that cabin officials' discretion.  *Id.* at 133.

UCLA's Major Event Policy 862 is facially vague and overbroad.  Although it lists criteria for officials to consider when assessing event security—such as venue location and weather conditions—the list is amorphous and non-exhaustive. *See* Compl.¶130.  The policy also gives UCLA officials broad discretion to "adjust[] the venue, date, and/or time of [an] event," and to cancel events based on an exercise of "professional judgment," but provides no other criteria for assessing relevant factors.

UCLA argues that these provisions are sufficiently definitive to overcome a facial challenge.  DefBr. at 19.  It bases this conclusion on the claim that "Plaintiffs . . . state no actual or hypothetical situations

in which [the] discretion [conferred by the policy] may result in arbitrary enforcement." *Id.*  But the Robert Spencer event demonstrates conclusively that this is incorrect.

As detailed above, during April and May 2024, UCLA purportedly assessed the security needs of the Spencer event pursuant to Policy 862. Although UCLA dragged its feet until forced to engage with the process, it ultimately determined that security could be provided and gave YAF "final approval" to move forward on May 6, 2024.  But nine days later, on May 15, 2024, UCLA suddenly changed its tune.  UCLA was purportedly applying the *same criteria set forth in Policy 862* to the *very same set of facts* (including the physical layout of the Student Union building and the fact that anti-Israel activists were likely to protest the talk) on May 6 and on May 15.  That it nevertheless made *diametrically opposed security assessments* is more than sufficient to demonstrate the indeterminate nature of Policy 862.

As stated in *Forsyth County*, "the success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so."  505 U.S. at 133 n.10.  Not only is there nothing in Policy 862 to prevent UCLA from making

content-based decisions, it in fact did exactly that on May 15, 2024.

Plaintiffs have adequately stated a facial challenge to Policy 862.

## CONCLUSION

The Court should deny UCLA's motion.

DATED this 3rd day of February 2025.

Respectfully submitted,

*/s/ James Kerwin*

James L. Kerwin, CO Bar 57545*
William E. Trachman, CA Bar 261410
Grady J. Block, CO Bar 55085**
MOUNTAIN STATES LEGAL
FOUNDATION
2596 S. Lewis Way
Lakewood, Colorado 80227
Tele: (303) 292-2021
Fax: (877) 349-7074
jkerwin@mslegal.org
wtrachman@mslegal.org
gblock@mslegal.org
* Admitted *Pro Hac Vice*
** *Pro Hac Vice* Application
Forthcoming
Alexander Haberbush, CA Bar
330368
LEX REX INSTITUTE
444 West Ocean Boulevard, Suite
1403
Long Beach, CA 90802
ahaberbush@lexrex.org
*Attorneys for Plaintiffs*

# CERTIFICATE OF COMPLIANCE

Undersigned counsel of record for Plaintiffs certifies that this brief contains 6,998 words, which complies with this Court's word limit for memoranda of points and authorities.

DATED: February 3, 2025          */s/ James Kerwin*
                                 James Kerwin
                                 *Counsel for Plaintiffs*