O

# United States District Court
# Central District of California

YOUNG AMERICA'S FOUNDATION et al.,

     Plaintiffs,

  v.

GENE D. BLOCK et al.,

     Defendants.

Case № 2:24-cv-08507-ODW (AGRx)

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS [49]**

## I.  INTRODUCTION

Plaintiffs Young America's Foundation ("YAF"), Brooke Broll, and Macy Roepke bring this First Amendment action against Defendants Gene D. Block, Darnell Hunt, Michael S. Levine, Michael J. Beck, Monroe Gorden, Jr., Mick DeLuca, Mike Cohn, Jasmine Rush, and Rick Braziel, all current or former University of California, Los Angeles ("UCLA") officials.  (Compl., ECF No. 1.)[1]  Defendants move to dismiss the Complaint.  (Mot. Dismiss ("Mot." or "Motion"), ECF No. 49.)  For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.[2]

---

[1] Plaintiffs sue all Defendants in their personal and official capacities, except for Block, who Plaintiffs sue in his personal capacity only.  (Compl. ¶¶ 23–31.)

[2] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II.    BACKGROUND[3]

YAF is a nonprofit corporation that, among other things, sponsors programs to bring "conservative and liberty-minded points of view" to colleges and high schools, including to a YAF student group at UCLA ("UCLA YAF").  (Compl. ¶ 20.)  Broll and Roepke are both UCLA students and members of UCLA YAF.  (*Id.* ¶¶ 21–22.)

On or about April 13, 2024, UCLA YAF chairman, Matthew Weinberg, asked representatives of the UCLA Student Organizations, Leadership & Engagement ("SOLE") office to reserve a room in the Student Union for a talk on "Radical Islam on College Campuses" by Robert Spencer, the founder of an organization "dedicated to exposing dangerous and radical strains of Islamic thought."  (*Id.* ¶¶ 81–82.)  At some point, UCLA YAF changed the title of the talk to "Everything You Know About Palestine Is Wrong."  (*Id.* ¶ 82.)  On April 16, 2024, three days after Weinberg asked about holding the event in the Student Union, the Student Union confirmed that a room was available for May 15, 2024.  (*Id.* ¶ 83.)  Weinberg asked to reserve the room and requested campus security for the event "to contend with possible counter-protestors."  (*Id.* ¶¶ 83–84.)

In the meantime, on April 25, 2025, anti-Israel activists set up an "encampment" of tents, signs, and tables in Royce Quad.  (*Id.* ¶ 62.)  They established checkpoints around the encampment, required those wishing to cross to wear a wristband given to people who called for Israel's elimination, and excluded Jewish students and faculty who "refused to denounce their faith."  (*Id.* ¶ 63.)  Over the next week, participants in the encampments assaulted pro-Israel and Jewish students, professors, and bystanders.  (*Id.* ¶¶ 65–66.)  Despite these actions, UCLA "did nothing to remove [the encampment] or to hold those responsible to account" and even assisted activists in establishing a "border" to keep non-activists out of the area.  (*Id.*

---

[3] All factual references derive from the Complaint or attached exhibits, unless otherwise noted.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that well-pleaded factual allegations are accepted as true for purposes of a motion to dismiss).

¶¶ 70, 72.)   Finally, on May 2, 2024, one day after UCLA asked for help, the Los Angeles Police Department cleared the encampment.  (*Id.* ¶ 75.)

On April 26, 2024, Weinberg spoke with a SOLE representative about the Spencer event.  (*Id.* ¶ 89.)  The representative told Weinberg that "as far as he was concerned, the event was approved," but that he needed to confirm this with Cohn, SOLE's director.  (*Id.*)  On April 29, 2024, after not hearing from Cohn, Weinberg asked Cohn to confirm the room reservation and security arrangements.  (*Id.* ¶ 90.) The next day, UCLA held a virtual meeting to discuss the event.  (*Id.* ¶ 92.)

During the meeting, the participants, including YAF and UCLA Police Department ("UCLAPD") representatives, discussed security.  (*Id.* ¶ 93.)  UCLAPD representatives said that administrators would decide whether the school would provide security, and that the decision would depend on whether the encampment was active at the time of the Spencer talk.  (*Id.* ¶ 94.)  On May 1, 2024, without event approval, YAF's counsel sent a letter to UCLA's counsel, demanding that the school approve the event and warning of the possibility of litigation.  (*Id.* ¶ 96; *see id.* Ex. B ("Letter"), ECF No. 1-2.)   By May 6, 2024, UCLA "appeared to provide final approval for the event."  (Compl. ¶ 97.)  At this point, Plaintiffs began advertising the Spencer talk.  (*Id.* ¶ 98.)

The evening before the event, Broll and Roepke projected an advertisement on the exterior of one of UCLA's buildings.  (*Id.* ¶ 102.)  Anti-Israel activists threatened to "shut down" the Spencer event.  (*Id.* ¶ 103.)  The activists stated that they would report Broll and Roepke for violating UCLA rules.  (*Id.* ¶ 104.)  Mere hours later, Rush, UCLA's Dean of Students, threatened Broll and Roepke with disciplinary action if they did not take down the projection, even though campus rules did not ban this activity.  (*Id.* ¶ 105.)  Anti-Israel activists also posted on social media that they would try to "cancel" and "shut down" the event.  (*Id.* ¶ 110.)

The day of the Spencer event, Broll, Roepke, and others from YAF, went to inspect the event space.  (*Id.* ¶ 107.)  UCLA staff told them to leave the room, which

1  was then locked. (*Id.*) SOLE and Student Union representatives stated that they were

2  unable to find the key to the now-locked space. (*Id.* ¶ 108.) Two hours later, Braziel

3  told YAF that UCLA had decided to move the event to another space, as UCLA was

4  unable to provide adequate security for the Spencer event. (*Id.* ¶ 109.) The new

5  venue would be in the geology building, around a half mile from the originally

6  scheduled spot. (*Id.* ¶ 111.) Broll and Roepke allege that UCLA could have

7  adequately secured the Student Union location. (*Id.* ¶ 112.) They further allege that

8  the new location was "not a reasonable or neutral alternative" and that "changing the

9  location at the last second without any advance warning would limit attendance." (*Id.*

10  ¶¶ 116–17.) The location also had "very limited foot traffic" and was "inappropriate

11  for the audio-visual equipment" Plaintiffs intended to use. (*Id.* ¶¶ 117–18.)

12  In deciding to change locations, UCLA officials acted pursuant to UCLA

13  Interim Policy 862. (*Id.* ¶ 126; *see id.* Ex. C ("Interim Policy 862"), ECF No. 1-3.)

14  This policy has since been updated. (*Id.* Ex. D ("Updated Interim Policy 862"), ECF

15  No. 1-4.) These policies apply to "Major Events." (Compl. ¶ 147.) They define a

16  "Major Event" to include, as relevant here, an event that "[t]he Chancellor or the

17  Chancellor's designee determines . . . is likely to significantly affect campus safety . . .

18  or significantly affect campus services." (Interim Policy 862 § II.) In making this

19  determination, the Chancellor must consider "Safety and Security Criteria" and the

20  UCLAPD's assessment. (Interim Policy 862 §§ III, IV.B.1.) The policies provide

21  several factors to guide this assessment. (Interim Policy 862 § III.C; Updated Interim

22  Policy 862 § VIII.)

23  Under both policies, UCLAPD must "assess security needs" using these criteria

24  to determine if "an event is likely to significantly affect campus safety and security or

25  significantly affect campus services." (Interim Policy 862 § IV.B.1; Updated Interim

26  Policy 862 § III.G.) The policies provide that "UCLAPD will make security

27  recommendations that, in UCLAPD's professional judgment, will address security

28  threats identified," and that the goal of these recommendations is to: (1) "[m]inimize

risks to the health and safety of the event participants and audience;" (2) "[m]inimize risks to the campus and surrounding community"; (3) "[s]upport the ability of the Event Organizers to successfully hold the event"; and (4) "[r]espect the exercise of rights of free expression by the Event Organizer, participants, and the community, including lawful protestors."    (Interim Policy 862 § IV.B.1; Updated Interim Policy 862 § III.G.)    "[S]ecurity measures may include adjusting the venue, date, and/or time of the event; providing additional law enforcement; imposing controls or security checkpoints; requiring increased ticketing measures . . . ; and creating buffer zones around the venue."  (Interim Policy 862 § IV.B.1; Updated Interim Policy 862 § III.G.)  Also, the new policy sets an annual cap for money UCLA will spend on security to address threats against Major Events.  (Updated Interim Policy 862 § III.F.)

On October 3, 2024, Plaintiffs initiated this action.  (Compl.)  Plaintiffs assert two First Amendment claims under 42 U.S.C. § 1983 for UCLA's actions in connection with the Spencer talk for viewpoint discrimination and heckler's veto.  (*Id.* ¶¶ 163–75.)  Plaintiffs also bring a facial challenge under § 1983 to Updated Interim Policy 862 for violating the First Amendment.  (*Id.* ¶¶ 176–84.)  As relief, Plaintiffs seek damages.  (*Id.*, Prayer ¶¶ A–B, K–N.)  They also ask for a declaration that Defendants violated the First Amendment and that Updated Interim Policy 862 is overbroad and facially unconstitutional.  (*Id.*, Prayer ¶ C.)  Lastly, they seek various injunctions against Defendants, including to prohibit them from enforcing caps on "Major Events," as defined in Updated Interim Policy 862; and enforcing the "security measure" rules in Updated Interim Policy 862.  (*Id.*, Prayer ¶¶ D–I.)

Defendants now move to dismiss the claims against them under Federal Rules of Civil Procedures ("Rule" or "Rules") 12(b)(1) and 12(b)(6).  (Mot.)  The Motion is fully briefed.  (Opp'n, ECF No. 54; Reply, ECF No. 57.)

### III.    LEGAL STANDARD

#### A.    Rule 12(b)(1)

Under Rule 12(b)(1), a district court must dismiss a complaint when the court lacks subject matter jurisdiction, which includes when a plaintiff lacks constitutional standing. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Because standing . . . pertain[s] to a federal court's subject-matter jurisdiction under Article III, [it is] properly raised in a motion to dismiss under [Rule] 12(b)(1)."). To satisfy Article III standing, a plaintiff must show that (1) he has suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged actions of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The party attempting to invoke a court's jurisdiction bears the burden of proof for establishing jurisdiction. *See Sopcak v. N. Mountain Helicopter Serv.*, 52 F.3d 817, 818 (9th Cir. 1995).

#### B.    Rule 12(b)(6)

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). However, a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## IV.    DISCUSION

Defendants move to dismiss Plaintiffs' first two claims under Rule 12(b)(6) and their third claim under Rules 12(b)(1) and 12(b)(6).

## A.    Viewpoint Discrimination

In their first claim, Plaintiffs allege that Defendants violated the First Amendment by "discriminating against Plaintiffs' speech because of the viewpoint expressed" when Defendants decided to relocate the Spencer event at the last minute. (Compl. ¶ 165.) Defendants move to dismiss for failure to state a claim. (Mot. 9–12.)

Plaintiffs allege that Defendants relocated the event "because they disagree with Plaintiffs' point of view." (Compl. ¶ 167.) In support, they allege that Defendants "appl[ied] vastly different standards to anti-Israel activities . . . and pro-Israel expression" by treating anti-Israel events with "extreme deference," while subjecting pro-Israel events "to extreme vetting, exacting review, and last minute cancellation." (*Id.* ¶ 166.) They also contend that Defendants' asserted justification for moving the event—a "security-driven decision"—was pretextual and that Defendants intended "to thwart the ability of Mr. Spencer to reach his intended audience." (*Id.* ¶ 119.)

In moving to dismiss this claim, Defendants argue that Plaintiffs' allegations are conclusory and undermined by other allegations made in the Complaint. (Mot. 9–12.) First, Plaintiffs do not plausibly allege that any Defendant held anti-Israel views. (*Id.* at 9.) Second, per Plaintiffs' allegations, there was a legitimate security threat from holding the event in the Student Union. (*Id.* at 9–10.) Third, Plaintiffs do not

cite any anti-Israel speech that Defendants permitted under similar circumstances.  (*Id.* at 11.)

The government engages in viewpoint discrimination when it targets "not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  Conversely, a policy is viewpoint neutral if it does "not favor one speaker's message over another's regarding the same topic." *Flint v. Dennison*, 488 F.3d 816, 833 (9th Cir. 2007).  Even if a policy is viewpoint neutral on its face, "that does not foreclose" a claim that the policy was applied in a viewpoint discriminatory manner.  *Seattle Mideast Awareness Campaign v. King County (SeaMAC)*, 781 F.3d 489, 502 (9th Cir. 2015).  To succeed on a viewpoint discrimination claim, plaintiffs must allege "that the government intended to 'suppress expression merely because public officials oppose the speaker's view.'"  *Id.* (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

However, allegations of pretext are not enough to survive a motion to dismiss.  Rather, plaintiffs must "plead facts that make plausible their claim that they were moved because of their viewpoint." *Moss v. U.S. Secret Service (Moss II)*, 711 F.3d 941, 961 (9th Cir. 2013), *rev'd sub nom. on other grounds*, *Wood v. Moss*, 572 U.S. 744 (2014).  The Ninth Circuit's decisions in *Moss* elucidate this pleading requirement.  In that case, protestors critical of then-President George W. Bush brought a First Amendment claim against Secret Service agents for relocating a demonstration.  *Moss v. U.S. Secret Service (Moss I)*, 572 F.3d 962, 964 (9th Cir. 2009).  Pro- and anti-Bush demonstrators protested near an inn at which Bush was dining.  *Id.* at 965.  Secret Service agents directed police to clear the street where anti-Bush demonstrators were protesting but allowed pro-Bush demonstrators to protest a block away.  *Id.* at 965–66.  Thus, anti-Bush demonstrators alleged that Secret Service agents engaged in viewpoint discrimination when they moved the anti-Bush protestors away from the public area outside of the inn.  *Id.* at 969–70.

The Ninth Circuit identified the critical question as whether the anti-Bush demonstrators' "allegation that the [a]gents ordered the relocation of their demonstration *because of* its anti-Bush message is plausible, not merely possible." *Id.* at 970. On a motion to dismiss, the court considered "[t]he bald allegation of impermissible motive on the [a]gents' part" and that the agents had a policy of suppressing speech critical of Bush to be "conclusory." *Id.* The court turned to the anti-Bush demonstrators' "specific factual allegations to determine whether" it could "reasonably infer a First Amendment violation." *Id.* Considering the anti-Bush demonstrators' allegations that the agents ordered their relocation but allowed similarly situated pro-Bush demonstrators to remain, the court found this did *not* support a plausible First Amendment violation because anti-Bush demonstrators failed to allege that Agents moved them farther from the inn than the pro-Bush demonstrators. *Id.* at 971–72.

After the anti-Bush demonstrators amended their complaint, the case returned to the Ninth Circuit in the same posture. *See Moss II*, 711 F.3d at 941. This time, the court concluded that anti-Bush demonstrators plausibly stated a viewpoint claim. *Id.* at 961. The court identified three factual allegations that made plausible the claim that the protestors "were moved because of their viewpoint—that the security rationale . . . was pretextual." *Id.* First, anti-Bush demonstrators alleged that they posed no threat to Bush at the location at which they initially protested. *Id.* They also alleged that, had anti-Bush demonstrators posed a threat to Bush, then pro-Bush demonstrators— who were not relocated—also posed a threat. *Id.* Second, the Secret Service permitted pro-Bush demonstrators to gather along the motorcade route, within range to use guns or explosives, yet anti-Bush demonstrators were relocated farther away from the Bush than the pro-Bush demonstrators. *Id.* Lastly, anti-Bush demonstrators made "twelve detailed allegations, relying on published reports, of similar instances of viewpoint discrimination against protestors expressing negative views of the

President," which supported the otherwise conclusory allegation that the Secret Service had a policy of protecting the President from dissent. *Id.*

Viewing the allegations in the Complaint in the light most favorable to Plaintiffs, this case is closer to *Moss I* than *Moss II*. Here, Plaintiffs fail to plausibly allege that Defendants' security-driven rationale is pretextual. As to the security-driven justification for moving the Spencer event, Plaintiffs allege that this decision was pretextual. (*See* Compl. ¶ 119.) However, their factual allegations undermine this conclusory allegation. Indeed, Plaintiffs' allegations support that there was a justifiable security reason for moving the event. Upon requesting the Student Union space for the Spencer event, Plaintiffs themselves requested security due to "possible counter-protestors." (*Id.* ¶ 84.) Plaintiffs detail specific threats anti-Israel activists made to them the night before the event, as the activists "accosted Plaintiffs . . . [and] threaten[ed] to 'shut down' the" Spencer event. (*Id.* ¶ 103.) Plaintiffs also describe activist social media posts stating that "they would seek to 'cancel' and 'shut down' the event." (*Id.* ¶ 110.) And they discuss past actions by anti-Israel activists that support the seriousness of these threats: anti-Israel activists had set up an "encampment" in the Royce Quad in which they "prevent[ed] anyone who disagreed with them from accessing" the quad, assaulted students and faculty, and excluded Jewish students and faculty who "refused to denounce their faith." (*Id.* ¶¶ 63–66.)

Further, Plaintiffs' allegation that "[m]oving the event to the remote location would also have been counterproductive from a security perspective," (*id.* ¶ 115), is conclusory. Plaintiffs' support for this contention is that "giving in to the demands of potentially violent and disruptive counter protestors is not a way to prevent violence or to enhance campus security," as "giving in would have exactly the opposite effect by encouraging more of the same in the future." (*Id.*) Perhaps this is true as a policy matter, but this allegation speaks to whether Defendants had a good security strategy, not whether Defendants used those concerns as a pretext for viewpoint discrimination.

Plaintiffs also fail to allege that Defendants permitted anti-Israel speech in similar situations such as would make Defendants' alleged bias plausible rather than merely possible. For support, Plaintiffs point to instances where Defendants permitted anti-Israel speech on campus from as early as 2014. (*See, e.g.*, Compl. ¶¶ 41, 44, 46.) But these instances are not like the alleged violation here. Plaintiffs' do not allege that any of the identified prior events posed security concerns similar to anti-Israel activists' response to the Spencer event. In fact, Plaintiffs identify two prior incidents where activists threatened speakers, and both were cancelled or relocated. (*See id.* ¶¶ 79, 103, 110.) That only anti-Israel protestors have threatened events, (*see id.*), does not make Defendants' decision to cancel (or relocate) the threatened events discriminatory.

Ultimately, Plaintiffs fail to make "specific factual allegations" such that it "is plausible, not merely possible," that Defendants ordered the relocation of the Spencer event because of its pro-Israel message. *Moss I*, 572 F.3d at 970. Just as in *Moss I*, Plaintiffs cannot state a claim for which relief can be granted. Accordingly, the Court **DISMISSES** this claim. Also as in *Moss I*, this dismissal is **with leave to amend**.

**B. Heckler's Veto**

Plaintiffs' second claim is for Defendants providing a "heckler's veto." (Compl. ¶ 173.) Through this claim, Plaintiffs allege that Defendants violated the First Amendment "by caving in to the demands of anti-Israel protestors who set out to cancel and 'shut down' Plaintiffs' expression." (*Id.* ¶ 172.)

"A 'heckler's veto' is an impermissible content-based speech restriction where the speaker is silenced due to an anticipated disorderly or violent reaction of the audience." *United States v. Rundo*, 990 F.3d 709, 719 (9th Cir. 2021). This veto "is a form of content discrimination, generally forbidden in a traditional or designated public forum." *Meinecke v. City of Seattle*, 99 F.4th 514, 522 (9th Cir. 2024). The doctrine is different in a limited public form because "what's forbidden is viewpoint discrimination, not content discrimination." *SeaMAC*, 781 F.3d at 502. Still, even in

that limited public forum, "[a] claimed fear of hostile audience reaction could be used as a mere pretext for suppressing expression because public officials oppose the speaker's point of view." *Id.*

The parties agree, at least for purposes of the Motion, that the Student Union is a limited public forum.   (Mot. 12–14; Opp'n 11 n.1.)   Despite this agreement, Plaintiffs predominantly address the wrong standard by describing the test for traditional and designated public fora and primarily citing cases concerning those fora. (Opp'n 13–14); *see, e.g.*, *Jones v. Bd. of Regents of Univ. of Ariz.*, 436 F.2d 618, 619–20 (9th Cir. 1970) (concerning forum "open to the public generally"); *Bible Believers v. Wayne County, Mich.*, 805 F.3d 228, 242 (6th Cir. 2015) ("The parties agree that the Festival constituted a traditional public forum . . . .").   The gist of Plaintiffs' argument is that Defendants violated the First Amendment by "giving in to hecklers." (Opp'n 12.)   Plaintiffs assert that "governmental authorities have an affirmative duty to protect the speaker [threatened with violence] by addressing the hecklers' conduct." (*Id.* at 13.)   Per Plaintiffs, when security concerns "arise from hecklers seeking to silence disfavored views, the First Amendment calls on the government to do so in a specific way: by confronting the hecklers."  (Opp'n 22 (emphasis omitted).)

This may be true for speech in traditional and designated public fora.  (*See* Opp'n 14–15 (collecting cases)); *Meinecke*, 99 F.4th at 522.   But the government is not required to do so in limited public fora.   *See SeaMAC*, 781 F.3d at 496, 500 (contrasting traditional and designated public forum test with limited public forum test).   Rather, "[i]n limited public forums, content-based restrictions are permissible, as long as they are reasonable and viewpoint neutral."   *Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 650–51 (9th Cir. 2019).

As to Plaintiffs allegations concerning the lack of viewpoint neutrality, the Court has already concluded that they fail to adequately allege that Defendants moved the Spencer event based because they opposed the speaker's pro-Israel views. Moreover, "[o]n its face," Interim Policy 862 "is viewpoint neutral."  *SeaMAC*,

781 F.3d at 501.  The policy calls for the Chancellor to determine if an "event is likely to significantly affect campus safety" or "significantly affect campus services." (Interim Policy 862 § II.)   The non-exhaustive listed criteria for making this determination are viewpoint neural.  (*See id.* § III.C.)  If the Chancellor decides that an event is likely to pose this risk, then UCLAPD must "address security threats"— identified through the same criteria—through various security measures, including adjusting the venue, date, or time of an event.  (*Id.* § IV.B.1.)

For Defendants to avoid liability, the policy must also be reasonable.  *Amalgamated Transit*, 929 F.3d at 650.   To determine whether a content-based restriction is "reasonable," courts look to three components: (1) "whether the policy standard is reasonable in light of the purpose served by the forum"; (2) "whether the standard is sufficiently definite and objective to prevent arbitrary or discriminatory enforcement by the government officials"; and (3) "whether an independent review of the record supports" the conclusion."  *Id.* at 651 (cleaned up).  However, even if Interim Policy 862 was not reasonable, and Plaintiffs plausibly allege a First Amendment violation on this basis, Plaintiffs' damages claim must be dismissed because they cannot overcome the doctrine of qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).   Qualified immunity requires a two-pronged analysis: (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct."  *Id.* at 232 (citations omitted).  A court may address either prong of the qualified immunity analysis first.  *Id.* at 236.  "[I]f the answer to either [prong] is 'no,'" then the Court need not analyze the other prong, as the officer is entitled to qualified immunity.  *Gordon v. County of Orange*, 6 F.4th 961, 968 (9th Cir. 2021).

Dismissal under Rule 12(b)(6) is only appropriate where a court "can determine, based on the complaint itself, that qualified immunity applies." *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)

"To meet the 'clearly established' requirement, the law at the time of the conduct must have been 'sufficiently clear' that every 'reasonable official would have understood that what he is doing' was unlawful." *DeFrancesco v. Robbins*, 136 F.4th 933, 939 (9th Cir. 2025) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Thus, "[t]he right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority." *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019).

Plaintiffs assert that "[c]aselaw going back at least fifty years firmly establishes that UCLA had a duty to take reasonable action to protect Robert Spencer from potential hecklers before burdening his speech." (Opp'n 26.) But Plaintiffs' cases do not support this proposition. As with their argument that Defendants violated the First Amendment by permitting a heckler's veto, each of Plaintiffs' cases concern speech in traditional and designated fora. *See, e.g.*, *Jones*, 436 F.2d at 619–20; *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515–16 (1939) (concerning city's exclusion of speakers from "streets and parks," which "have immemorially been held in trust for the use of the public"). By defining speaker's rights in traditional and designated fora that are not applicable in limited public fora, these cases could not put Defendants on notice of the constitutional violations Plaintiffs allege here. Simply put, the First Amendment does not impose a duty on public universities to take reasonable action to protect speakers from hecklers in limited public fora. Even if it did, Plaintiffs have not cited a single case showing that this right was "clearly established" at the time of the alleged violation.

Moreover, Plaintiffs argue they put Defendants on notice when, prior to the event, YAF sent a letter to UCLA's counsel citing authority describing Defendants' obligations. (Opp'n 26; *see* Letter.) But, again, the authority Plaintiffs cited

concerned Defendants' obligations in traditional or designated public fora.  (Letter 4.)[4] And even if Plaintiffs' description of their rights in the Letter is correct, a description of one's rights in a letter does not make them clearly established such that it is "settled law."  *See Tuuamalemalo*, 946 F.3d at 477.

Plaintiffs do not even dispute that Defendants would be entitled to qualified immunity if the Policy violates the First Amendment due to its lack of definiteness and objectivity.  (*See generally* Opp'n.)  Nor have they offered any case law to support that this right is clearly established in the context of public university decisions as to where to hold campus events.  (*See generally id.*)  Therefore, Plaintiffs have not carried their burden to show "that the right allegedly violated was clearly established at the time of the alleged misconduct."  *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021).  Defendants are thus entitled to qualified immunity on Plaintiffs' second cause of action.  To the extent Plaintiffs seek damages on this claim, the Court **DISMISSES** this claim **WITH PREJUDICE**.[5]

## C.    Facial Challenge

Plaintiffs' final claim is a facial challenge to Updated Interim Policy 862. (Compl. ¶¶ 176–84.)  Plaintiffs allege that the policy is unconstitutionally vague and overbroad and gives government officials broad discretion to decide what speech is allowed.  (*Id.*)  Defendants raise two issues in challenging this claim.  First, they assert that Plaintiffs lack standing to bring this facial challenge for prospective relief because Plaintiffs have not shown an imminent risk of future injury.  (Mot. 19–22.)  Second, Defendants argue that Updated Interim Policy 862 is sufficiently definite and objective to survive Plaintiffs' facial challenge.  (*Id.* at 19–20.)

---

[4] *See, e.g.*, *Meinecke*, 99 F.4th at 521 ("It is also beyond doubt that Meinecke's speech occurred in traditional public fora . . . ."); *Cent. Fla. Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1521 (11th Cir. 1985) ("The crucial concern here is the extent of the right of the public to use the city streets and parks, which the Supreme Court has regarded as quintessential public forums . . . .").

[5] To the extent Plaintiffs raise a facial challenge to Updated Interim Policy 862 within their second cause of action, the Court considers this challenge identical to Plaintiffs' third cause of action for injunctive relief and addresses those together.

1          1.      *Standing*

2          Defendants first move to dismiss Plaintiffs' facial challenge for lack of

3   standing.  (*Id.* at 19–22.)

4          "For injunctive relief, which is a prospective remedy, the threat of injury must

5   be 'actual and imminent, not conjectural or hypothetical.'"      *Davidson v.*

6   *Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting *Summers v. Earth*

7   *Island Ins.*, 555 U.S. 488, 493 (2009)). "'[T]he threatened injury must be *certainly*

8   *impending* to constitute injury in fact' and 'allegations of *possible* future injury are not

9   sufficient.'"  *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

10  "Past exposure to illegal conduct does not in itself show a present case or controversy

11  regarding injunctive relief if unaccompanied by any continuing, present adverse

12  effects." *Lujan*, 504 U.S. at 564 (cleaned up).  Therefore, when "standing is premised

13  entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood

14  that he will again be wronged in a similar way.'"  *Davidson*, 889 F.3d at 967 (quoting

15  *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

16         However, "special standing principles apply in First Amendment cases." *Santa*

17  *Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1033 (9th Cir.

18  2006).  "In the prior restraint context, . . . 'the mere existence of the licensor's

19  unfettered discretion, coupled with the power of prior restraint,' can threaten First

20  Amendment values even if such discretion and power are never actually abused."

21  *United States v. Linick*, 195 F.3d 538, 541 (9th Cir. 1999) (quoting *City of Lakewood*

22  *v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988)).  Therefore, "a party subject to

23  a regulatory scheme may challenge the scheme on its face, without first applying for a

24  permit, whenever the scheme allegedly vests authorities with substantial power to

25  allow or deny expressive activity."  *Id.*  "This is because 'without standards to fetter

26  the licensor's discretion, the difficulties of proof and the case-by-case nature of "as

27  applied" challenges render the licensor's action in large measure effectively

28  unreviewable.'"  *Real v. City of Long Beach*, 852 F.3d 929, 933 (9th Cir. 2017)

(quoting *City of Lakewood*, 486 U.S. at 758–59).  As a result, "[t]he Supreme Court
and the Ninth Circuit have repeatedly allowed facial attacks premised on the grant of
unbridled discretion to a licensing official" so long as a plaintiff meets two
requirements.  *Kaahumanu v. Hawaii*, 682 F.3d 789, 802 (9th Cir. 2012) (collecting
cases).  "First, a plaintiff must satisfy the standing requirements of Article III by
showing that the challenged provision or provisions apply to its conduct."  *Id.*
"Second, the challenged regulation granting discretion must have a close enough
nexus to expression, or to conduct commonly associated with expression, to pose a
real and substantial threat of the identified censorship risks."  *Id.* (cleaned up).

As to the first requirement, Plaintiffs have alleged that the challenged
provisions of Updated Interim Policy 862 provide the Chancellor and UCLAPD with
unfettered discretion to subject Plaintiffs' events to restrictions.  (Compl. ¶¶ 180–81.)
Plaintiffs have plausibly alleged that they intend to bring conservative and pro-Israel
speakers to campus in the future.  (*Id.* ¶ 145.)  As alleged, at least some of those
events would be characterized as "Major Events," such that the Chancellor and
UCLAPD could determine that the events are subject to restrictions like change of
venue, date, or time of the event.  (*See id.* ¶ 152 (alleging that "conservative and pro-
Israel events . . . will be deemed Major Events every time" because "[a]nti-Israel and
left-wing activists have pledged to 'shut down' and 'cancel' pro-Israel and
conservative speakers").)

As to the second requirement, Updated Interim Policy 862, which regulates
whether and where students like Plaintiffs may speak on campus, "ha[s] a close
enough nexus to expression, or to conduct commonly associated with expression, to
pose a real and substantial threat of the identified censorship risks."  *Kaahumanu*,
682 F.3d at 802; *see S. Or. Barter Fair v. Jackson Cnty., Or.*, 372 F.3d 1128, 1135
(9th Cir. 2004) (allowing facial challenge where the regulation "is broad enough to
cover gatherings that are expressive," even if the regulations also regulate "purely
recreational" gatherings "devoid of expressive purposes").

Accordingly, at this stage, Plaintiffs have established standing to assert a facial challenge to Updated Interim Policy 862, to the extent the policy vests the Chancellor or UCLAPD with discretion to determine whether and what kind of security measures to impose on an event.

In contrast, to the extent Plaintiffs challenge the policy's annual cap for money UCLA will spend on security to address threats against Major Events, they fail to establish standing. (*See* Updated Interim Policy 862 § III.F; Compl. ¶ 151 (alleging UCLA may shut down events because it "has reached its arbitrary cap on security spending").) These spending caps apply to all Major Events, so Plaintiffs cannot allege that the policy provides UCLA officials with unfettered discretion. Also, Plaintiffs have not alleged that it is certainly impending that UCLA's security costs will exceed the annual cap such that Plaintiffs will no longer be permitted to host events. (*See* Compl. ¶¶ 146–53 (describing policy).) Therefore, the Court **DISMISSES WITHOUT PREJUDICE** and **WITH LEAVE TO AMEND**. Plaintiffs' claims for injunctive relief challenging Updated Interim Policy 862's annual cap on security spending for Major Events.

### 2. *Definite & Objective*

Defendants separately move to dismiss Plaintiffs' facial challenge on the merits, arguing that Updated Interim Policy 862 is sufficiently definite and objective to survive Plaintiffs' challenge. (Mot. 19–20.) Plaintiffs disagree, arguing that the policy "is facially vague and overbroad." (Opp'n 30–32.)

As discussed, to assert a facial challenge to a policy regulating speech in limited public fora—like Updated Interim Policy 862—Plaintiffs must allege that the standard is not "sufficiently definite and objective to prevent arbitrary or discriminatory enforcement by the government officials." *Amalgamated Transit*, 929 F.3d at 651 (cleaned up).

On this inquiry, the Ninth Circuit in *SeaMAC* considered a policy that excluded transit ads "so objectionable under contemporary community standards as to be

reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system." 781 F.3d at 500. The court held that the criteria was "sufficiently definite and objective to prevent arbitrary or discriminatory enforcement" by government officials because the "ultimate criterion is an objective one: reasonably foreseeable harm to, disruption of, or interference with the transportation system." *Id.* Conversely, in *Amalgamated Transit*, the Ninth Circuit was "skeptical" about the definiteness and objectivity of a policy banning ads that "express or advocate an opinion, position, or viewpoint on matters of public debate about economic, political, religious or social issues." 929 F.3d at 654 (internal quotation marks omitted). Unlike with the *SeaMAC* policy, the court in *Amalgamated Transit* reasoned that the policy there did not contain "objective criteria to provide guideposts for determining what constitutes prohibited 'public issue' advertising." *Id.* at 655. For example, the policy provided no guidance to determine whether a statement concerning "the right to organize" is one of fact (e.g., employees legally have a right to collectively bargain) or one that "might prompt a response from the 'right to work' movement and would thus cause 'highly emotional debate.'" *Id.* at 654–55.

Here, Plaintiffs challenge Updated Interim Policy 862 based on the discretion it provides Defendants both to categorize an event as a "Major Event" and to determine what kind of security measures to impose. (Compl. ¶ 184.)

UCLA's policy of determining when an event is a "Major Event" is like the policy in *SeaMAC*. It defines a "Major Event" to include, as relevant here, an event that "[t]he Chancellor or the Chancellor's designee determines . . . is likely to significantly affect campus safety . . . or significantly affect campus services." (Updated Interim Policy 850 Ex. A at 25, ECF No. 1-4.) In making this determination, the Chancellor must consider "safety and security criteria" and the UCLPAD's assessment. (*Id.* at 26.) Such criteria include

(a) [the] nature of the event, that includes: (i) the estimated number of participants, (ii) whether alcohol is intended to be served, (iii) the estimated duration of the event, and (iv) any objective and credible evidence regarding possible threats to campus safety or security; (b) the proximity of the event to other activities or locations that may interfere, obstruct, or lessen the effectiveness of the security measures being implemented; (c) the resources needed to secure the event; (d) the anticipated weather conditions; and (e) any similar viewpoint neutral considerations relevant to assessment of campus safety, security, and services . . . .

(*Id.*)  The Chancellor's determination that an event is "likely to significantly affect campus safety" or "campus services" is indistinguishable from the *SeaMAC* determination of whether an ad would cause "reasonably foreseeable harm to, disruption of, or interference with the transportation system." *SeaMAC*, 781 F.3d at 500.  In fact, a determination about campus safety is less amorphous on its face than one considering interference with the transportation system.  Plaintiffs complain that the criteria are non-exhaustive and do not specify how the Chancellor should balance them.  (*See* Opp'n 30.)  But that does not alter the Court's conclusion that the Chancellor's determination of Major Events is definite and objective.  The ad policy in *SeaMAC* listed no criteria.  *See* 781 F.3d at 500.  UCLA's definite and objective definition of Major Event does not become less definite and objective when it lists criteria to make this decision, even if the list is non-exhaustive.  If anything, the criteria make UCLA's definition *more* definite and objective than the policy in *SeaMAC*.  Ultimately, the definition of "Major Event" does not leave courts "with the specter of a 'standardless standard' whose application will be immune from meaningful judicial review." *Id.*

However, the inquiry does not end there.  Plaintiffs take issue with Updated Interim Policy 862 providing discretion to officials to determine "what kind of 'security measures' to impose for an event" and for not "explain[ing] how each factor impacts the need for a particular 'security measure.'" (Compl. ¶ 181.)  Therefore, Updated Interim Policy 862 must also provide definite and objective standards to

guide what security measures officials should impose in the event of "security threats." (Updated Interim Policy 862 § III.G.)

Under the policy, "UCLAPD and the Operational Assessment Team (OAT) will conduct a security/interference assessment" based on the same above-described criteria. (*Id.*) They "will make security/interference determinations that, in UCLAPD's/OAT's professional judgment, will address [the identified] security threats." (*Id.*) "The goals of UCLAPD's/OAT's security/interference determinations" are to: (1) "[m]inimize risks to the health and safety of the event participants and audience"; (2) "[m]inimize risks to the campus and surrounding community"; (3) "[s]upport the ability of the Event Organizers to successfully hold the event"; and (4) "[r]espect the exercise of rights of free expression by the Event Organizer, participants, and the community, including lawful demonstrators." (*Id.*) "Required security measures and measures to minimize interference may include adjusting the venue, date, and/or time of the event; providing additional law enforcement or other safety-related personnel; imposing controls or security checkpoints; requiring increased ticketing measures . . . ; and creating buffer zones around the venue." (*Id.*)

At this stage, Plaintiffs have plausibly alleged that the policy is not sufficiently objective and definite for UCLAPD/OAT to determine what security measures to recommend. Once UCLAPD/OAT determines that an event is likely to significantly affect campus safety and campus services and needs "security measures" to "address security threats and potential interference," the policy does not provide guidance on how UCLAPD/OAT should determine *what* security measures to impose. It simply provides UCLAPD/OAT with a menu of options and lets them choose based on their "professional judgment." (*Id.*)

For example, in this case, Defendants moved the Spencer event to another venue based on a prior iteration of the policy, meaning that, per the policy, Defendants would have decided that moving the event to the new venue would address security threats. But the policy does not address how Defendants should act if providing

additional law enforcement would have also addressed the security threats. (*See* Compl. ¶ 112 (alleging that "there was no reason that the Student Union location could not be adequately secured").) In such a situation, Updated Interim Policy 862 does not appear to provide "definite and objective" criteria for UCLAPD/OAT to decide whether to move the event or add additional law enforcement to the original venue. Rather, it provides four "goals of UCLAPD's/OAT's security/interference determinations" with no guidance on how to balance them or how they factor into deciding which security measures to impose. (*Id.*) Without such guidance, Plaintiffs plausibly allege that policy "lacks objective criteria to provide guideposts for determining what" security measures to impose. *Amalgamated Transit*, 929 F.3d at 655. Therefore, at this stage, Plaintiffs' have plausibly alleged a facial challenge to Updated Interim Policy 862's "security measures" rules. (*See* Compl. ¶ 184.) Accordingly, the Court **DENIES** Defendants' Motion to the extent they seek dismiss Plaintiffs' challenges to enjoin Updated Interim Policy 862 based on the discretion as to what security measures to impose on Major Events.

## V.    CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss. (ECF No. 49.) Specifically, the Court:

- **DISMISSES** Plaintiffs' first cause of action **WITH LEAVE TO AMEND** to add factual allegations consistent with the challenged pleading to cure the above noted deficiencies.

- **DISMISSES WITH PREJUDICE** Plaintiffs' second cause of action to the extent Plaintiffs seek damages.

- **DENIES** Defendants' Motion to Dismiss Plaintiffs' second and third causes of action to the extent Plaintiffs seek to enjoin Updated Interim Policy 862 based on the discretion as to what security measures to impose on Major Events.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- **DISMISSES WITH LEAVE TO AMEND** Plaintiffs' claims for injunctive relief challenging Updated Interim Policy 862's annual cap on security spending for Major Events.

If Plaintiffs chooses to amend, they must file the First Amended Complaint no later than **twenty-one (21) days** from the date of this Order, in which case Defendants shall answer or otherwise respond within **twenty-one (21) days** of the filing.   If Plaintiffs do not timely amend, the dismissal as to their first cause of action shall be deemed a dismissal with prejudice, as of the lapse of the deadline to amend.

**IT IS SO ORDERED.**

August 11, 2025

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**